UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ELIZABETH McMURRAY,             ]
                                ]
    Plaintiff,                  ]
                                ]   CV-00-N-2440-S
vs.                             ]
                                ]
PHARMERICA, INC.,               ]
                                ]
    Defendant.                  ]

**Memorandum of Opinion**

**I.   Introduction**

This case is based on Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act. Plaintiff's complaint seeks recovery for defendant's failure to promote her to the position of Chief Pharmacist in July 1999.[1] Such failure, plaintiff alleges, constitutes discrimination against her on the basis of age and gender. The court now has for consideration the defendant's motion for summary judgment, filed August 19, 2001. [Doc. # 19.] The issues have been briefed by both parties and are now ripe for decision. Upon due consideration, the motion will be denied.

---

[1] In her complaint, plaintiff notes a number of instances in which defendant did not promote her. However, as defendant points out in its brief, counsel for plaintiff represented on the record during plaintiff's deposition that plaintiff only intends to pursue a claim for failure to promote to Chief Pharmacist in July 1999. That plaintiff only seeks relief for the July 1999 failure to promote is further demonstrated by the fact that her brief in response to the summary judgment motion addresses only that claim. Thus, plaintiff asserts only two claims in this lawsuit: failure to promote based on age (ADEA) and failure to promote based on gender (Title VII), both relating to the 1999 promotional decision.

## II.     Facts[2]

Plaintiff was born on March 13, 1958. (McMurray Dep. at 15-16.) She graduated from Samford University School of Pharmacy in May 1993. (*Id.* at Ex. 10.) During her time in pharmacy school, she worked as an extern/intern at Lloyd Noland Hospital, the V.A. Hospital, Eckerd Drugs, and defendant PharMerica. (*Id.* at 21-22.) While working as an intern at PharMerica, McMurray rotated through the different areas of the operation. (*Id.* at 24-26.) She received her pharmacist's license in August 1993. (*Id.* at 32.)

Plaintiff was first employed by PharMerica as a Staff Pharmacist in PharMerica's Birmingham, Alabama pharmacy in July 1995. (Def.'s Ex. B.) She initially worked on the evening shift, working seven days on and seven days off. (McMurray Dep. at 62-63.) Her responsibilities included dispensing pharmaceuticals and supervising four or five technicians. (McMurray Dep. at 63-64.) In January 1996, plaintiff spoke with Scott Arledge, then the General Manager of defendant's Birmingham pharmacy, about her interest in the newly vacant position of Pharmacy Supervisor. (*Id.* at 66-68, 74.) Arledge explained to her that she should move to the day shift to take on extra responsibilities. (*Id.*) In the same month, Plaintiff transferred to a position as day-shift pharmacist and also applied for the vacant position of Chief Pharmacist. (*Id.* at 66-68, 78.) The Chief Pharmacist position was filled by Dane Yarbrough. (Def.'s Ex. C.) Plaintiff admits that Yarbrough was more qualified than she was for the position of Chief Pharmacist. (McMurray Dep. at 87.)

---

[2] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

On July 31, 1996, McMurray received a performance review in which she scored "satisfactory" or "very good" in every category. (*Id.* at Ex. 6.) In October 1996, she moved to a position as a consulting pharmacist to gain experience in a different area of the company. (*Id.* at 96-97.) As a consulting pharmacist, she visited various health care facilities that served as clients of PharMerica. (*Id.* at 98-101.)

In February 1997, Plaintiff applied for the vacant position of Chief Pharmacist. (Def.'s Ex. E.) The position was filled by Randy Norman. (Def.'s Ex. F; McMurray Dep. at 108.) Plaintiff admits that Norman was more qualified than she was for the position of Chief Pharmacist. (McMurray Dep. at 115.) In late spring or early summer of 1997, plaintiff returned to her day shift job as a dispensing pharmacist. (*Id.* at 121-22.) In July of that year, she received her performance evaluation for the prior year. (*Id.* at Ex. 11.) Her overall score was 700, which "somewhat exceeds position requirements." (*Id.*)

On August 29, 1997, Plaintiff was promoted to the position of Pharmacy Supervisor. (Def.'s Ex. G; McMurray Dep. at 127-28.) The primary responsibility of the Pharmacy Supervisor is to supervise the pharmacy technicians, which includes scheduling them and filling out their performance reviews. (McMurray Dep. at 127-29, 133.) The number of technicians under her supervision at any time could be as high as twenty. (*Id.* at 188.) As Pharmacy Supervisor, plaintiff was responsible for performing the duties of the Chief Pharmacist and General Manager when they were not present at the facility. (*Id.* at 142, 189; Norman Dep. at 59-60.) Although she was the Pharmacy Supervisor, plaintiff also continued to work as a dispensing pharmacist. (McMurray Dep. at 141.)

While serving as Pharmacy Supervisor, plaintiff was involved in an argument with two

pharmacy technicians, one of whom resigned immediately thereafter. (*Id.* at 144-53.) On one occasion, plaintiff took an extended lunch without informing Norman, her immediate supervisor, that day that she intended so to do, even though she alleges that she had told him earlier in the week that she intended to do so. (*Id.* at 251-52.) She cried when Norman confronted her about this leave from work. (*Id.*) Norman, in fact, referred to her behavior as "hysterical." (Def.'s Ex. D at Ex. F.) Immediately after discussing the extended lunch with Norman, plaintiff left work before the end of her shift. (*Id.* at 253-56.)

In July 1998, after working as Pharmacy Supervisor for approximately a year, McMurray received her performance review from Norman. (*Id.* at 154-55, Ex. 16.) Her overall score on the review was 745, which was in the range of "Somewhat Exceeds Position Requirements." (*Id.*) However, the review stated, in more than one section, that plaintiff needed to continue to improve upon her people skills. (Def.'s Ex. H; McMurray Dep. at 153-55.)

In the fall of 1998, the Birmingham facility lost a full-time pharmacist, so plaintiff had to perform extra duties to make up for the lost employee. (*Id.* at 167-68.) She was working fifty to sixty hours per week. (*Id.* at 183-84.) She discussed with Norman the fact that she was overburdened. (*Id.* at 168-69, 180.) On January 6, 1999, plaintiff voluntarily resigned from the position of Pharmacy Supervisor to return to her original position as Staff Pharmacist. (Def.'s Ex. I; McMurray Dep. at 167.) Plaintiff stated in her January 6, 1999, resignation letter "I find that I am not able to perform all of the duties that I feel are my responsibility." (Def.'s Ex. I.) Plaintiff left work for the remainder of the day after resigning. (Def.'s Ex. I; McMurray Dep. at 169.) On the day following her resignation as Pharmacy

Supervisor, plaintiff spoke with Norman, then the Chief Pharmacist, about the situation; he told her that her resignation would not hurt her chances of moving up in the company. (McMurray Dep. at 192-93.) About two weeks later, she discussed the resignation with Yarbrough, the General Manager, who told her that he considered the resignation not to have happened. (*Id.* at 194.) They agreed that plaintiff would continue to serve as Pharmacy Manager. (*Id.*) Although there was a shifting in some of her job responsibilities, her pay as a supervisor was not decreased. (*Id.* at 195.)

Because she had multiple family events upcoming in April through mid-July 1999, plaintiff attempted but was unable to obtain approval from defendant to use her accumulated paid time off. (*Id.* at 197-99.) She discussed her alternatives with Yarbrough, and, initially, plaintiff returned to the night shift by switching shifts with Neil Parekh. (*Id.* at 204-05.) Shortly thereafter, Parekh needed to return to the night shift to accommodate his taking classes during the day. (*Id.* at 205; Parekh Dep. at 32.) On April 30, 1999, plaintiff resigned from her position as Staff Pharmacist and asked to be placed on "casual status" as of June 30, 1999. (Def.'s Ex. J; McMurray Dep. at 201.) By requesting "casual status," plaintiff would work only on an as-needed basis. (Giordano Dep. at 63.) Plaintiff put this request in writing so that the Birmingham facility would be able to get approval for a new pharmacist. (McMurray Dep. at 207.) She did not actually go casual until July 5, 1999. (*Id.*) Yarbrough assured her that her decision to go casual would not affect her advancement in the company. (*Id.* at 220.) During the summer of 1999, plaintiff received her yearly performance review, on which she scored a 685. (*Id.* at Ex. 21.) A score of 685 is in the range of "Fully Meets Requirements." (*Id.*)

In the summer of 1999, the Chief Pharmacist position became available after the announcement of the departure of Norman. (Def.'s Ex. L.) Plaintiff applied for this position and interviewed with Yarbrough. (Def.'s Ex. M; McMurray Dep. at 240-41, 264.) In July 1999, the Chief Pharmacist position was filled by Neil Parekh. (Def.'s Ex. N.) Shortly thereafter, on August 4, 1999, plaintiff resigned from PharMerica. (Def.'s Ex. P.) Robin Trapolino, another pharmacist at defendant PharMerica, was also passed over for the promotion in favor of Parekh. (Trapolino Dep. at 22.) In her deposition, Trapolino referenced a discrimination charge that she had filed with the EEOC over defendant's failure to promote her and stated that shortly after Parekh was awarded the promotion, Yarbrough, the General Manager of the Birmingham pharmacy and the undisputed primary decision maker in regard to the promotion, told her that he was surprised that she had applied for the Chief Pharmacist position and that Parekh had received the job because defendant PharMerica had been grooming him for it. (*Id.* at 29-30; Ex. 1.)

Plaintiff's complaint revolves around the promotion of Neil Parekh to Chief Pharmacist rather than herself in 1999. Parekh had graduated from pharmacy school in May 1998. (Parekh Dep. at 19.) While he was in pharmacy school, he had externed with PharMerica, beginning in 1995. (*Id.* at 11.) During his externship with PharMerica, he had taken "casual status" so that he could help his parents with their hotel business. (*Id.* at 14-15.) After a few months, he returned to PharMerica, where he worked until he graduated. (*Id.* at 19.) After he graduated from pharmacy school, in August 1998, defendant hired Parekh as a full-time pharmacist. (*Id.* at 22.) As a pharmacist, he worked the night shift, where he supervised several technicians but no other pharmacists. (*Id.* at 23-25.) Plaintiff

alleges the following differences between herself and Parekh at the time that Parekh was promoted to Chief Pharmacist in 1999: (1) Plaintiff held a preceptor and consulting license, while Parekh did not have these licenses (McMurray Dep. at 40, 267; Parekh Dep. at 28-29); (2) Plaintiff was IV-certified, while Parekh was not (McMurray Dep. at 34-35; Parekh Dep. at 28); (3) Plaintiff had been a licensed pharmacist since 1993, while Parekh had been a pharmacist for less than a year (McMurray Dep. at 32; Parekh Dep. at 35); and (4) Plaintiff had previosly reviewed employees, while Parekh had never written employee evaluations. (McMurray Dep. at 274, 281-82.)

As General Manager of the Birmingham PharMerica pharmacy, Yarbrough was the primary decision-maker in regard to the July 1999 Chief Pharmacist position. (Yarbrough Dep. at 20, 101-02.) PharMerica has an Equal Employment Opportunity Policy. (Giordano at ¶ 6.) In her capacity as Regional Director of Human Resources for PharMerica, Linda Giordano works with the pharmacies located within her region to ensure compliance with PharMerica's Equal Employment Opportunity Policy. (*Id.* at. ¶ 7.) By virtue of her position, Giordano has the authority to exercise veto power over any employment decisions that would violate PharMerica's Equal Employment Opportunity Policy. (*Id.* at ¶ 7.) Yarbrough consulted with Giordano and obtained her approval concerning the 1999 Chief Pharmacist promotional decision made by PharMerica. (*Id.* at ¶¶ 9-10.)

Plaintiff has presented evidence of several comments made by individuals involved in the decision to promote Parekh. Robin Trapolino, who had also applied for Chief Pharmacist in 1999, alleged that Yarbrough had told her that he was surprised she applied for the position because PharMerica had been grooming Parekh for the job. (Trapolino

Dep. at 29-31, Ex. 1.) Plaintiff claims that Ann Early, a nurse consultant for defendant, told her that the Regional Manager, Scott Arledge, had told her that Parekh got the job because he was young and had no family. (McMurray Dep. at 305.) In her deposition, however, Early states that this was only a rumor that she had heard from other pharmacists and that she heard no such thing from anyone in management. (Early Dep. at 14-15.) Early testified that Yarbrough commented that at her age, pretty soon he wouldn't be able to tell the difference between her and a nursing home resident. (Early Dep. at 17-18.) She also said that Yarbrough made a similar comment about Alma Vest, who works in bookkeeping. (*Id.* at 19.) On an occasion when a female employee called in sick from work, Yarbrough stated that women are always calling in sick. (*Id.* at 18, 20.) Once, when Early was crying at work, he commented that women are too emotional. (*Id.* at 18-21.)

### III. Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (*quoting* Rule 56(c), Fed. R. Civ. P.). The movant can meet this burden by presenting evidence showing that there is no dispute of

material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (*quoting* Rule 56(e), Fed. R. Civ. P.).

After the plaintiff has properly responded to a motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed. R. Civ. P. The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movants is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12

(11th Cir. 1988).

## IV. Discussion

Defendant seeks summary judgment as to the entirety of plaintiff's claim. Alternatively, defendant seeks summary judgment on plaintiff's claim for punitive damages under Title VII and liquidated damages under the ADEA. Each issue is treated separately below.

### A. Summary Judgment as to the Entirety of Plaintiff's Claim

Plaintiff argues that the defendant discriminated against her by not promoting her to the position of Chief Pharmacist in the summer of 1999, but, instead, promoted Neil Parekh. In order to succeed at summary judgment on a claim of disparate treatment in a promotional decision, a plaintiff must show purposeful discrimination on the part of the defendant. *See Baldwin v. Birmingham Bd. of Educ.*, 648 F.2d 950 (5th Cir. 1981). Purposeful discrimination can be shown by either direct or circumstantial evidence. *See Berman v. Orkin Exterminating Co., Inc.*, 160 F.3d 697, 701 (11th Cir. 1998). Direct evidence is evidence that, "if believed, would prove the existence of a fact [in issue] without inference or presumption." *Carter v. Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989). Should a plaintiff produce direct evidence that discrimination motivated the employment decision complained of, the defendant must prove that the same employment decision would have been made in the absence of the discriminatory motivation. *See id.* The court points out, however, that "[f]or statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision." *Trotter v. Board of Trustees of the Univ. of Ala.*, 91 F.3d 1449, 1453-54 (11th Cir. 1996).

In the absence of direct evidence, this court applies the *McDonnell Douglas/Burdine* framework established by the Supreme Court. *See McDonnell Douglas v. Green*, 411 U.S. 792 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). This framework is applied in both Title VII and ADEA cases. *See Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000); *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000). Accordingly, a plaintiff must demonstrate the defendant's discriminatory intent by establishing a prima facie case of discrimination. *See Berman*, 160 F.3d at 701-02. "To establish a prima facie case of Title VII sex discrimination in a promotional decision, a plaintiff must prove: (1) that she is a member of a protected minority; (2) that she was qualified and applied for the promotion; (3) that she was rejected despite these qualifications; and (4) other equally or less qualified employees who are not members of the protected minority were promoted." *Lee*, 226 F.3d at 1253. The elements of a prima facie case of age discrimination are almost identical. Under the ADEA, the plaintiff must establish that he or she: "(1) was a member of the protected age group, (2) was subjected to adverse employment action, (3) was qualified to do the job, (4) was replaced by or otherwise lost a position to a younger individual." *Chapman*, 229 F.3d at 1024.

Once the plaintiff has shown a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for promoting another individual instead of the plaintiff. *See* Lee, 226 F.3d at 1253. Should the defendant articulate such a reason, "the plaintiff must then establish that the defendant's proffered reasons for the employee's rejection were pretextual." *Id.* "A plaintiff may overcome the employer's asserted legitimate reasons and avoid judgment as a matter of law either directly by

persuading the court that a discriminatory reason more likely motivated the employer or *indirectly by showing that the employer's proffered explanation is unworthy of credence.*" *Taylor v. Runyon*, 175 F.3d 861, 867 (11th Cir. 1999) (citation and internal quotation marks omitted) (italics in original). "The district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (citation and internal quotation marks omitted).

Generally, summary judgment is inappropriate if the plaintiff is able to both establish a prima facie case of discrimination and offer evidence from which a reasonable jury could find that the employer's profferred, non-discriminatory reasons for its employment action are not worthy of credence. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 146-47 (2000). However, as the Supreme Court has also noted:

> [T]here will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. . . . Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

*Id.* at 148-49.

Turning to the evidentiary record, it is clear that plaintiff has established a prima facie case of discrimination under both Title VII and the ADEA. As to Title VII, plaintiff has put forth evidence that: (1) she is a member of a protected minority (female); (2) she was qualified and applied for the position of Chief Pharmacist; (3) she did not receive the promotion; and (4) Neil Parekh, who was equally or less qualified for the promotion, received it. As to a prima facie case under the ADEA, plaintiff has shown that: (1) she is a member of the protected age group (over forty); (2) she was subjected to adverse employment action in that she was not promoted; (3) she was qualified to do the job; and (4) Neil Parekh, who is younger than her, was awarded the promotion that she sought. Indeed, defendant does not dispute that plaintiff has established a prima facie case of discrimination under both Title VII and the ADEA. *See* Def.'s Initial Submission Br. at 11.

Because plaintiff has established a prima facie case, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for promoting Neil Parekh rather than plaintiff to the position of Chief Pharmacist. Defendant has set forth three reasons for not promoting the plaintiff, all of which appear to be non-discriminatory in nature: "(1) Plaintiff resigned from a supervisory position-Pharmacy Supervisor-approximately 6 months prior to the Chief Pharmacist position becoming available; (2) Plaintiff requested that she only work a few hours per week shortly after resigning from her supervisory position; and (3) Plaintiff engaged in some emotionally-charged, unprofessional behavior while working in a supervisory capacity." *Id.* at 12. As defendant points out, plaintiff admitted to engaging

in all of the conduct that gave rise to these three reasons.³ Importantly, defendant does not assert that the reason for promoting Parekh over plaintiff was based on a comparison of their qualifications for the position. Thus, plaintiff's extensive evidence regarding her qualifications as opposed to those of Parekh are of limited value in rebutting the allegedly non-discriminatory reasons of the defendant.

Under the standards enunciated earlier, because defendant has proffered legitimate, non-discriminatory reasons for its failure to promote plaintiff, the burden returns to the plaintiff to produce evidence from which a reasonable jury could conclude that the proffered reasons are merely pretextual. Though both parties spend much of their respective briefs arguing the relevance of particular evidence to the showing of pretext, and whether that evidence is admissible, the court finds that plaintiff has presented several undisputed facts that form a sufficient basis upon which a reasonable jury could find that defendant did not rely on its proffered reasons when it decided to promote Parekh rather than plaintiff.

As to defendant's first reason, that plaintiff resigned from the supervisory position of

---

³According to defendant, the inquiry should end here. Relying on *Rice-Lamar v. Ft. Lauderdale, Fla.*, 232 F.3d 836 (11th Cir. 2000), defendant argues that when a plaintiff admits to engaging in the acts that form the basis for the non-discriminatory reasons for her dismissal, judgment is due defendant as a matter of law. The court does not read *Rice-Lamar* as support for so strong a proposition. In that case, the Eleventh Circuit found that summary judgment was proper because plaintiff "failed to present any evidence demonstrating that [defendant]'s proffered explanation is pretextual." *Rice-Lamar*, 232 F.3d at 843. Even when there is no dispute that the plaintiff engaged in conduct that forms the basis of defendant's proffered reason for its employment decision, the plaintiff is still allowed an opportunity to show that the defendant did not actually rely on its proffered reasons in taking the actions that it did. *See McDonnell Douglas v. Green*, 411 U.S. 792 (1973) (remanding to the district court for a determination of whether defendant's proffered reason for not rehiring plaintiff, that he undisputedly engaged in certain behavior, was the actual reason for not rehiring plaintiff); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255-56 (1981) (holding that after the defendant has proffered non-discriminatory reasons for plaintiff's rejection, the plaintiff "now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision.").

- 14 -

Pharmacy Supervisor six months before the Chief Pharmacist position becoming available, plaintiff has presented uncontroverted evidence that the day after she resigned from the position, Randy Norman, Chief Pharmacist at the time, told her that her resignation would not hurt her chances of moving up in the company. Moreover, two weeks later, when plaintiff discussed the resignation with Dane Yarbrough, the pharmacy's general manager at the time, Yarbrough told her that he did not consider the resignation to have happened and that plaintiff would continue to serve as Pharmacy Supervisor. This fact is corroborated by the fact that plaintiff's salary did not change after her "resignation" from the Pharmacy Supervisor post.

As to defendant's second reason, that plaintiff requested that she only work a few hours per week shortly after resigning from her supervisory position, plaintiff presented uncontroverted evidence that the reason she requested this status was based on the fact that Randy Norman, Chief Pharmacist at the time, refused to approve her request to utilize her accumulated paid time off of five weeks. *See* McMurray Dep. at 197-201. Plaintiff showed that she had a number of family events coming up during that time. Further, plaintiff testified that she intended to return to a full-time position when such was available. *See id.* at 208-09. Plaintiff was assured by Yarbrough that her decision would not affect her advancement in the company.

Defendant asserted a final reason for its decision to not promote plaintiff: plaintiff had engaged in emotionally-charged, unprofessional behavior when she returned late from work one day and when she had interjected herself into an argument between two technicians. Although the plaintiff does not meet this particular, non-discriminatory reason

for defendant's promotional decision head-on, plaintiff's evidence of a comment made by Dane Yarbrough, the undisputed primary decision-maker as to the Chief Pharmacist promotion, shortly after Parekh's promotion tends to undermine all three reasons put forward by the defendant to justify its promotion decision. Robin Trapolino, who had also applied for Chief Pharmacist during the time at issue, approached Yarbrough shortly after the decision was made and asked him about it. Yarbrough told her that he was surprised she had applied for the position and that PharMerica had been grooming Parekh for the job. The court finds that such a statement undercuts the non-discriminatory reasons put forward by the defendant, such that a reasonable jury could find that the defendant did not rely on its proffered reasons.[4]

Based on the above-noted evidence, the court is convinced that the plaintiff has met her burden of presenting evidence from which the jury could disbelieve the proffered, non-discriminatory reasons put forward by the defendant to justify its promotional decision. Moreover, this is not such a case, contemplated by the Supreme Court in *Reeves v. Sanderson Plumbing Products, Inc.*, in which summary judgment is appropriate for the defendant even though the plaintiff has established a prima facie case and produced evidence of pretext. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148-49. Reviewing the factors set forth in *Reeves*, the plaintiff's prima facie case is strong (the defendant does not even challenge the plaintiff's prima facie case) and plaintiff's evidence that the employer's explanation is false is highly probative. *See id.* at 149. There is some

---

[4] Defendant argues that Yarbrough's statement is not relevant because it does not tend to show that Parekh was promoted for an improper reason. However, the statement is highly relevant because it tends to show that the defendant failed to promote plaintiff based on grounds other than the ones that it proffered.

evidence that the defendant did, in fact, rely on its proffered reasons for not promoting plaintiff. However, this evidence is limited to an EEOC filing in response to plaintiff's charge (Def.'s Ex. D), assertions by the defendant that it relied on those reasons, and handwritten notes taken by Yarbrough, apparently when he was considering who to promote (Def.'s Ex. T).[5] At the very least, however, the evidence produced by the plaintiff creates a sufficient ground upon which a reasonable jury could find that plaintiff was not promoted for a reason other than those proffered by the defendant.

Because plaintiff has established a prima facie case of discrimination under both Title VII and the ADEA, and has presented evidence from which a jury could find that plaintiff was not promoted for reasons other than those proffered by the defendant, summary judgment is inappropriate and defendant's motion will be denied.

### B.  Punitive and Liquidated Damages

Advancing a number of arguments, defendant urges this court to dismiss plaintiff's claims for punitive damages under Title VII and liquidated damages under the ADEA. The court notes that these issues are heavily fact-laden. *Cf. Kolstad v. ADA*, 527 U.S. 526, 534-36 (1999) (discussing the fact that the determinative aspect in regard to the award of punitive damages under Title VII involves not the acts of the defendant but the defendant's state of

---

[5] Apparently, though defendant has nothing to say in regard to the notes as they relate to the instant issue, Yarbrough took notes of his decision, listing pros and cons for each candidate. *See* Def.'s Ex. T. Though the notes are difficult to read, it appears that Yarbrough listed plaintiff's cons as "cannot handle 'stress' at all - has walked out 2 times that I know of," "only works as casual employee," "not liked by majority of staff," and "professionalism needs work!" *See id.* Apart from the hearsay issues presented by the offering of these notations for the truth of what they assert, *see* Fed. R. Evi. 802, the notes indicate the tension between the defendant's asserted reasons and the reason that Yarbrough shortly thereafter gave to Trapolino for Parekh's promotion. As a reasonable jury could believe Trapolino's statement of what Yarbrough told her, the defendant's position is sufficiently undercut to the point of precluding summary judgment.

mind); *United States EEOC v. Massey Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1250 (11th Cir. 1997) (holding that the question of "willfulness," the standard under which liquidated damages are awarded in ADEA cases, "is a question of fact for the jury, raising, as it does, issues of the employer's knowledge and understanding of the relationship between certain conduct and the legal requirements of the ADEA"). In this case, the fact issues are such that the court will await determination by a jury before considering defendant's motion in this regard.[6] Thus, the motion will be denied.

## V. Conclusion

Accordingly, defendant's motion for summary judgment will be denied. An appropriate order will be entered contemporaneously herewith.

Done, this 1st of Nov. ~~October~~, 2001.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE

---

[6] The court notes that other courts, in Title VII cases, have disposed of the very issues raised by the defendant after the jury has returned a verdict. *See, e.g., Lambert v. Fulton County, Ga.*, 253 F.3d 588, 594 (11th Cir. 2001) (noting that district court took motion to dismiss offered prior to closing arguments under advisement and ruled on it after return of verdict in which jury awarded punitive damages); *United States EEOC v. W&O, Inc.*, 213 F.3d 600, 609 (11th Cir. 2000) (after denying defendant's motions for judgment as a matter of law as to punitive damages during trial, district court again dealt with propriety of punitive damages in resolving post-trial motions); *Miller v. Kenworth of Dothan*, 82 F. Supp. 2d 1299 (M.D. Ala. 2000) (addressing and disposing of defendant's motion for judgment as a matter of law in regard to, *inter alia*, punitive damages after verdict); *Johnson v. Stone Container*, 88 F. Supp. 2d 1295, 1299 (N.D. Ala. 2000) (resolving issue of propriety of punitive damages on post-trial motion for new trial or remittitur).